**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| TAPESTRY MANAGEMENT SERVICES, INC., *et al.*,[1] | ) | Case No. 26-11777 (TMH) |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |

**DECLARATION OF DAVID R. CAMPBELL, CHIEF RESTRUCTURING OFFICER OF THE DEBTORS, IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, David R. Campbell, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief:

1. On October 30, 2026, I was appointed the Chief Restructuring Officer of Tapestry Management Services, Inc. ("TapestryHealth") and the other debtors and debtors in possession (collectively with TapestryHealth, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"). I am authorized to submit this declaration (the "Declaration") in support of: (i) the Debtors' voluntary petitions (collectively, the "Petitions") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), filed on the date hereof (the "Petition Date"); and (ii) the motions and applications filed contemporaneously herewith (collectively, the "First Day Pleadings").

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are Tapestry Management Services, Inc. (9744), Tapestry Pharmacy Consulting LLC (2776), Chess Medical, P.C. (4399), Chess Medicine PLLC (2119), Emerald Fern Wellness PC (8794), Tapestry Health PLLC (2498), Tapestry Medical, P.C. (9757), Tapestry Medicine PLLC (1329), Tapestry TeleHealth PLLC (2399), Topaz Bay Senior Health PC (2183) and Rosewood Hills Healthcare PC (1207). The location of the Debtors' service address is: 99 Hawley Lane, Suite 1102, Stratford, CT 06614.

2. Since November 2016, I have been a Managing Director of HGPS, LLC, formerly known as Getzler Henrich & Associates LLC ("Getzler Henrich"), the Debtors' proposed financial advisor in these Chapter 11 Cases. Getzler Henrich is a restructuring advisory firm that provides operational and financial advisory services to middle-market businesses and their stakeholders.

3. I have more than twenty years' experience with in- and out-of-court restructuring initiatives. I have worked with companies, private equity firms, banks, family offices, and commercial lenders by providing leadership, operational, and strategic advice in a wide range of corporate finance transactions, including reorganizations, liquidations, mergers and acquisitions, and debt and equity financings.

4. On October 8, 2026, Getzler Henrich was retained by the Debtors as financial advisor. As leader of the engagement, I have reviewed, become familiar with, and have personal knowledge of the Debtors' day-to-day operations, financial statements, capital structure, liquidity needs, and books and records. I have worked closely with the Debtors' management and other professionals in connection with the Debtors' restructuring efforts.

5. The Debtors continue to operate their businesses and manage their properties as debtors in possession. I submit this Declaration to provide an overview of the Debtors' business and these Chapter 11 Cases and in support of the First Day Pleadings, as well as other pleadings filed or to be filed in these Chapter 11 Cases.

6. Except as otherwise indicated, the statements set forth in this Declaration are based upon: (i) my personal knowledge of the Debtors' operations, capital structure, and financing; (ii) my review of relevant documents; (iii) information supplied to me by members of the Debtors' management and the Debtors' professional advisors; or (iv) my opinion based on my knowledge

and experience as a restructuring professional. If called to testify, I could and would testify competently to the facts set forth herein.

7. I have reviewed the Petitions and the First Day Pleadings and believe that the filing of the Petitions and the relief sought in the First Day Pleadings are in the best interests of the Debtors' estates, their creditors, and other parties in interest, and are necessary to preserve and maximize the value of the Debtors' estates. Moreover, I believe that the relief sought by the First Day Pleadings is tailored properly to minimize the adverse effects of the chapter 11 filings on the Debtors' ongoing efforts to operate and sell their business as a going concern.

## I. Overview of the Debtors' Business and Financial Affairs

### A. The Debtors' Business

8. The Debtors are a physician-led, technology-enabled provider of remote medical services, including chronic care management ("CCM"), behavioral health integration ("BHI"), remote physiologic monitoring ("RPM"), and other clinical services, to residents of skilled nursing facilities ("SNFs") through a facility-mediated care model. While the Debtors provide some traditional in-person and telehealth evaluation and management services to Medicare beneficiaries in SNFs, the majority of the Debtors' services involve non-face-to-face monitoring and care management. The Debtors' advanced practice providers, working under physician-directed care plans and supported by continuous device data, act as a remote extension of facility staff, catching changes in conditions early and preventing hospitalizations.

9. The Debtors' patients are among the most medically complex and vulnerable in the Medicare program: elderly and disabled SNF residents who live with chronic conditions, multiple comorbidities, cognitive impairment, and functional limitations and who depend on continuous monitoring and coordinated care.

10. Care is arranged through the partner facility, which acts as the resident's caregiver and is the Debtors' primary point of contact. The Debtors' platform integrates with partner facility electronic medical records, delivers daily patient-centric risk reports and monthly assessments, and deploys passive, continuous monitoring devices in patient rooms. In addition to passive monitoring devices, the Debtors also deploy electronic medical record connected devices that automate collection of traditional vitals on a more frequent basis, so the Debtors can deliver individualized daily health risk analytics reports and monthly risk assessments.

11. Partner facilities report that the Debtors' services identify changing conditions before they become clinically apparent, help prioritize residents most at risk of deterioration, and materially reduce hospitalizations. In one case study, an administrator reported that the rehospitalization rate at a SNF where the Debtors provided patient care fell from more than 30% to approximately 2% after implementation. Another facility reported that these services were "proving invaluable" by allowing staff to prioritize interventions with those patients that were most at risk.

12. Before the Medicare payment suspensions described below, the Debtors served more than 140,000 residents across approximately 1,500 SNFs nationwide. These service recipients included approximately 33,000 beneficiaries in roughly 690 facilities in rural or federally designated underserved areas, as well as approximately 115 facilities in the nation's most remote communities. By detecting changes in residents' conditions early and treating them in place, the Debtors' continuous care programs not only improve patient outcomes, they help prevent an estimated 1,000 hospitalizations per month, likely saving Medicare approximately $130 million annually.

13. More than 80,000 of the Debtors' patients network-wide were Medicare beneficiaries. Medicare reimbursement constitutes more than 63% of the Debtors' revenue.

14. The Debtors provided these services through more than 1,395 physicians, nurse practitioners, nurses, and clinical reviewers. The Debtors' workforce is nearly entirely remote, with the vast majority of employees working from their homes or other fixed locations of their choosing.

B. The Debtors' Corporate Structure

15. As set forth on the organizational chart attached as Exhibit A, TapestryHealth, a Delaware corporation, wholly owns, directly or indirectly, and/or manages each of the Debtors. TapestryHealth is the sole member of Tapestry Pharmacy Consulting LLC, a Delaware limited liability company.

16. The remaining nine Debtors are physician entities (each individually, a "Physician Entity" or collectively, the "Physician Entities") that are managed by TapestryHealth pursuant to management services agreements and are co-borrowers with TapestryHealth under the Debtors' prepetition credit facilities. Each Physician Entity is a separately organized entity that furnishes clinical services through its own licensed practitioners and submits Medicare claims in its own name.

17. Equity ownership of TapestryHealth consists of Class A Common Stock of which a majority is held by Tapestry Telehealth Solutions, Inc., Series A Preferred Stock of which a majority of the outstanding shares are held by AMP Associates LLC ("AMP") and Pondfield Holdings LLLP, and Class B Non-Voting Common Stock.

18. TapestryHealth is managed by a Board of Directors (the "Board"). On October 30, 2026, the Board established a special committee (the "Special Committee") and delegated to it,

among other things, authority over: (i) the review, evaluation, negotiation, and approval of any restructuring, recapitalization, sale, merger, liquidation, or other strategic or financial transaction; (ii) whether, when, and how TapestryHealth and its subsidiary and affiliates should commence cases under the Bankruptcy Code; and (iii) the retention and termination of advisors, including restructuring counsel, a notice and claims agent, an administrative advisor, and any other legal counsel, accountant, financial advisor, or other professional the Special Committee deems necessary, appropriate, or advisable, together with the execution of retention agreements, payment of retainers, and filing of applications to retain such professionals (as further described in the Board's Unanimous Written Consent dated October 30, 2026, the "Restructuring Matters").

19. On October 30, 2026, the Board appointed Louis Robichaux to serve as an independent member of the Board (the "Independent Director"). The Independent Director is the sole member and chair of the Special Committee. I communicate as often as needed with the Special Committee and will also provide weekly written reports to the Special Committee on liquidity and the status of the Restructuring Matters.

C. The Debtors' Capital Structure

20. As of the Petition Date, the Debtors' funded secured debt obligations total approximately $11.7 million. The Debtors' unsecured subordinated debt under the AMP Loan (as defined below) totals approximately $8 million.

21. ABL Credit Agreement. The Debtors, as borrowers, are party to that certain Credit and Security Agreement dated as of August 15, 2025 (as amended by that certain Joinder and Amendment No. 1 thereto dated as of December 31, 2025, that certain Joinder and Amendment No. 2 thereto dated as of July 24, 2026, and that certain Forbearance Agreement and Amendment No. 3 thereto dated as of September 10, 2026 (the "ABL Forbearance Agreement"), and as

otherwise amended, restated, supplemented, or modified from time to time, the "ABL Credit Agreement"), by and among the Debtors, the financial institutions from time to time party thereto, as lenders, and LAGO Evergreen Credit, a Delaware statutory trust ("LAGO"), as successor administrative agent to MidCap Funding IV Trust (in such capacity, together with its successors and assigns, the "ABL Agent" and, together with the lenders party thereto, the "ABL Secured Party").

22. Under the ABL Credit Agreement, the ABL Secured Party agreed to provide funding to the Debtors in an aggregate amount of up to $25 million. As security for the Debtors' obligations under the ABL Credit Agreement, the Debtors granted the ABL Agent, for the benefit of the ABL Secured Party, first priority liens upon and security interests in substantially all of the Debtors' assets, including, without limitation, all accounts (including health-care-insurance receivables), inventory, equipment, general intangibles, intellectual property, contract rights (including under the management services agreements and all amounts payable thereunder), instruments, chattel paper, documents, commercial tort claims, cash, deposit accounts, securities accounts, investment property, letter-of-credit rights, supporting obligations, and books and records, and all products and proceeds of the foregoing.

23. Under the management services arrangements, the Physician Entity that furnished the services submits the claims, and substantially all of each Physician Entity's receipts are remitted to TapestryHealth, which uses those funds to pay the personnel and operating expenses required to support each Physician Entity's clinical operations. Each Physician Entity maintains its own government and commercial collection accounts. All funds deposited into those accounts are swept daily into TapestryHealth's concentration account, which is in turn swept to the ABL

Secured Party; the ABL Secured Party then makes funds available to TapestryHealth's operating account, which funds payroll and vendor obligations for all Debtors.

24. On September 10, 2026, in connection with the ABL Forbearance Agreement, TapestryHealth obtained an emergency advance under the ABL Credit Agreement, and on September 14 and 15, 2026, it obtained $2 million more in funding from AMP and other investors. That financing was obtained on terms reflecting TapestryHealth's distress, did not replace the withheld Medicare payments, and did not restore committed borrowing availability.

25. Term Loan Agreement. The Debtors, as borrowers, are party to that certain Loan and Security Agreement dated as of August 15, 2025 (as amended by that certain Joinder and First Amendment thereto dated as of December 31, 2025, that certain Joinder and Second Amendment thereto dated as of July 24, 2026, and as otherwise amended, restated, supplemented, or modified from time to time, the "Term Loan Agreement" and, together with the ABL Credit Agreement, the "Prepetition Credit Facilities"), by and among the Debtors, LAGO and LAGO Innovation Fund III, LLC, as lenders (together with their respective successors and assigns, the "Term Lenders"), and LAGO, as administrative agent and collateral agent for the Term Lenders (in such capacities, the "Term Agent" and, together with the Term Lenders, the "Term Secured Parties" and, together with the ABL Secured Party, the "Prepetition Secured Parties").

26. As security for the Debtors' obligations under the Term Loan Agreement, the Debtors granted the Term Agent, for the benefit of the Term Secured Parties, first priority liens upon and security interests in substantially all of the Debtors' personal property, including, without limitation, all accounts (including health-care-insurance receivables), inventory, equipment, general intangibles, intellectual property, deposit accounts, investment property, and books and records, and all proceeds of the foregoing. The Debtors' rights under the management services

agreements are further collaterally assigned to the Term Agent pursuant to that certain Collateral Assignment of MSO Documents dated as of August 15, 2025.

27. On October 1, 2026, the ABL Secured Party implemented cash dominion sweeps of all receipts. On October 9, 2026, the ABL Secured Party declared that the forbearance period had terminated, accelerated all obligations under the Prepetition Credit Facilities (as defined below), and reinstituted full cash dominion, including a daily sweep of all receipts.

28. On October 14, 2026, the ABL Secured Party advanced approximately $3.3 million to cover accrued payroll, taxes, and other critical expenses. The Secured Parties made further discretionary advances on October 16, October 23, October 28, and on November 5, 2026 to fund immediate and necessary operating, payroll, and other corporate needs.

29. AMP Loan and Other Unsecured Debt. On August 15, 2024, the Debtors obtained an unsecured, subordinated loan from AMP, an existing equity investor, in the principal amount of $6 million (the "AMP Loan"). The total outstanding for the AMP Loan is approximately $8 million with accrued payment-in-kind interest. The Debtors estimate that, as of the Petition Date, claims of other trade creditors total approximately $10,725,000.

## II. Events Leading to Filing the Chapter 11 Cases

30. The Debtors' liquidity crisis traces principally to one source: the suspension by the Centers for Medicare & Medicaid Services ("CMS"), without prior notice, of the Medicare reimbursements on which the Physician Entities depend. Those reimbursements account for approximately 60% of Tapestry Telehealth PLLC's ("Tapestry Telehealth") revenue, approximately 75% of Chess Medicine PLLC's ("Chess Medicine") revenue, approximately 98% of Topaz Bay Senior Health PC's ("Topaz Bay") revenue, approximately 83% of Chess Medical, P.C.'s ("Chess Medical") revenue, and substantially all of Emerald Fern Wellness PC's ("Emerald Fern") and Rosewood Hills Healthcare PC's ("Rosewood Hills") revenue.

31. The suspensions began with Topaz Bay. In January 2026, CMS placed a 100% hold on Topaz Bay's Medicare payments without prior notice. That suspension has now remained in place for approximately nine months.

32. On April 10, 2026, the United States Attorney's Office for the Southern District of New York issued civil investigative demands ("CIDs") under the False Claims Act, 31 U.S.C. § 3733, to TapestryHealth (CID No. 26-014), Tapestry Telehealth (CID No. 26-015), Chess Medicine (CID No. 26-016), and Chess Medical (CID No. 26-017), each with a return date of May 8, 2026. For four months after those demands were issued, CMS continued to pay Tapestry Telehealth's, Chess Medicine's, Emerald Fern's, Chess Medical's, and Rosewood Hill's Medicare claims. On August 28, 2026, the DOJ issued a CID to Topaz Bay.

33. Then, without warning, CMS suspended Medicare payments to Tapestry Telehealth on August 11, 2026, and to Chess Medicine on August 13, 2026. I understand that on or about August 14, 2026, TapestryHealth learned that Novitas Solutions, Inc. ("Novitas") had ceased all Medicare payments to Tapestry Telehealth and reversed $507,920 in payments already remitted to its account, and that during the same period other Medicare administrative contractors ("MACs") reversed approximately $417,402 more. These reversals, totaling $925,322, overdrew Tapestry Telehealth's account. Approximately $595,916 of them occurred before one of the MACs informed Tapestry Telehealth's counsel by telephone on August 17, 2026 that it had placed Tapestry Telehealth and Chess Medicine under a 100% payment suspension, and before Tapestry Telehealth received its suspension notice on August 19, 2026.

34. The suspensions then spread. I understand that by October 6, 2026, CMS had also suspended 100% of Medicare payments, without prior notice, to Emerald Fern. CMS also suspended Medicare payments to Chess Medical, effective October 8, 2026, but did not issue

notice of the suspension until November 4, 2026, two days before the Petition Date. I believe that CMS also suspended Medicare payments to Rosewood Hills (on or about October 9, 2026), however, Rosewood Hills has not received a notice of suspension.

35. I understand that MACs likewise reversed Medicare payments already remitted to Chess Medicine, Topaz Bay, Chess Medical, and Emerald Fern, as well as to Rosewood Hills. Rosewood Hills has not received a suspension notice, and Chess Medical did not receive its suspension notice until after its suspension had already taken effect. On October 9 and 14, 2026, approximately $81,135 in Medicare payments remitted to Rosewood Hills between October 8 and 13, 2026 was reversed; on October 14 and 15, 2026, approximately $851,929 in Medicare payments remitted to Chess Medical on October 9 and 13, 2026 was reversed.

36. The investigation does not explain the suspensions. The Department of Justice (the "DOJ") did not issue a CID to Topaz Bay (CID No. 26-036) until August 28, 2026, more than seven months after CMS began withholding 100% of Topaz Bay's Medicare payments; the same day, it issued a CID to Tapestry Telehealth Solutions, Inc. (CID No. 26-037). To my knowledge, the DOJ has issued no separate CID to Emerald Fern or Rosewood Hills, yet CMS has suspended 100% of Emerald Fern's Medicare payments and, I believe CMS has suspended Rosewood Hills' Medicare payments without notice.

37. The affected Debtors submitted detailed written rebuttals to their suspension notices. SafeGuard Services LLC ("SGS"), the Northeastern Unified Program Integrity Contractor, acknowledged Tapestry Telehealth's rebuttal on August 26, 2026 but did not issue a determination within 15 days. Instead, on September 21, 2026, twenty-seven days after receiving the rebuttal, SGS, on behalf of CMS, issued its Findings in Response to Rebuttal Statement, continuing the full suspension "until the completion of the investigation." Chess Medicine has

received only an interim response, and the UPIC South Western Administration, Qlarant Integrity Solutions, LLC ("Qlarant") responded to Emerald Fern's rebuttal on behalf of CMS. Qlarant confirmed receipt of the rebuttal, but to date, neither Qlarant nor CMS has provided a substantive response to the rebuttal

38. The responses CMS did issue contained basic errors that reflect a cursory review: they included a reference to an incorrect CPT code for cardiology services and incorrect references to the identified claims as mental health services for which the Debtors neither provided nor sought reimbursement.

39. The Debtors' efforts to obtain relief have met only deflection. I understand that on September 28, 2026, CMS advised that, in coordination with the DOJ, the suspensions of Tapestry Telehealth and Chess Medicine "will remain in place until DOJ has concluded its investigation," and directed all further inquiries to the DOJ. The DOJ, for its part, has indicated that the suspensions are a matter for the Debtors to challenge with CMS. I further understand that around this time, CMS declined Tapestry Telehealth's request for a meeting and denied its request for consideration of financial hardship, stating that payment suspension guidance "does not include authority for CMS to consider a request for relief from a payment suspension due to financial hardship" and that "[t]his determination is not appealable."

40. I understand that, to date, neither CMS nor any MAC has issued an overpayment determination, initiated setoff under 42 C.F.R. § 405.371(a)(3) (other than payment reversals made as part of the suspension), commenced revocation or exclusion proceedings, or commenced any enforcement action against any of the Debtors. The Debtors have been deprived of substantially all their Medicare revenue without any adjudicated finding against them.

41. The loss of this revenue forced the Debtors to curtail patient care. On August 28, 2026, TapestryHealth ceased performing clinical reviews for certain affected patients, and between August and October 2026 it discontinued services for approximately 50,000 Medicare patients.

42. The Debtors also reduced their workforce, by approximately 79%. Before the suspensions, they employed approximately 500 full-time employees ("FTEs"). TapestryHealth conducted four reductions in force on August 28 (25 employees), September 11 (29 employees), October 16 (206 employees), and October 29, 2026 (141 employees), and the Debtors now employ approximately 108 FTEs. Over the same period, the Debtors' independent contractor workforce fell from 1,354 to approximately 889.

43. At the same time, the Debtors' liquidity under the Prepetition Credit Facilities has deteriorated. The September 2026 emergency advance and investor financing did not replace the withheld Medicare payments or restore committed borrowing availability, and since the Prepetition Secured Parties terminated the forbearance period on October 9, 2026 and implemented daily cash sweeps beginning October 1, 2026, the Debtors have depended on the Prepetition Secured Parties' discretionary advances to fund payroll and other critical expenses. The suspensions have brought the Debtors to the brink of collapse.

44. The Debtors estimate that, as of November 1, 2026, they had furnished but not yet billed Medicare services Medicare payment amounts estimated at approximately $16.8 million. No claim for any of these amounts was submitted before the Petition Date; each will be billed and paid only postpetition. CMS has never reviewed, adjudicated, or questioned these claims, and, the claims remain within Medicare's twelve-month timely filing period.

45. A cessation of the Debtors' services would harm far more than the Debtors. When TapestryHealth enters a facility, it is typically the facility's only provider of CCM, RPM, and BHI

services and, under most of its facility agreements, is the facility's exclusive "preferred" provider. I am informed and believe that if services stop, facilities must identify and contract with replacement service providers, integrate systems, acquire (or replace) the remote monitoring and connected-vitals equipment that TapestryHealth now provides, enroll residents, and establish new clinical workflows. Beyond those operational challenges, alternative providers may be limited or simply unavailable in rural and underserved communities. The risk is most acute for the 115 facilities in the nation's most remote communities, where no substitute provider may be positioned to absorb the Debtors' patients.

46. Without the immediate relief requested in the First Day Pleadings and in the complaint commencing the adversary proceeding filed concurrently herewith (the "Adversary Complaint"), the Debtors cannot fund payroll, pay critical vendors and suppliers, or continue serving their patients.

## III. DIP Financing Needs

47. The Debtors have an immediate and critical need to obtain the DIP Loans[2] and to use Cash Collateral in order to, among other things, continue the operation of their businesses, including the provision of medical and related services to patients, maintain business relationships with payors, vendors, and suppliers, make payroll, satisfy other working capital and operational needs, and fund the administration of the Chapter 11 Cases, in each case in accordance with the

[2] Capitalized but undefined terms in this section have the same meaning ascribed to them in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Status; (III) Authorizing Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief* filed concurrently with this Declaration.

Approved Budget. Absent access to the DIP Facility (defined below) and the use of Cash Collateral, the Debtors, their estates, their creditors, and their patients would suffer immediate and irreparable harm.

48. In consultation with Getzler Henrich, the Debtors prepared a budget, a summary of which is to be filed with the Court in connection with the DIP Financing Motion (the "Approved Budget"), which reflects the Debtors' reasonable judgment as to the additional liquidity required over the specified period to keep the Debtors' businesses operational during these Chapter 11 Cases and to permit the Debtors and their advisors sufficient time to complete the Debtors' proposed sale processes.

49. The DIP Facility, which includes milestones requiring restoration of Medicare reimbursements, provides the liquidity the Debtors need to operate these Chapter 11 Cases until those reimbursements are restored. If the requested relief is granted, the Debtors intend to maintain their going-concern value while conducting an expedited but thorough sale process. Given the Debtors' diminished liquidity and the risk to patients and facilities if services cease, time is of the essence, and I believe these Chapter 11 Cases are in the best interests of the Debtors' estates and all parties in interest.

## IV. FIRST DAY PLEADINGS

50. Concurrently with the filing of their Petitions, the Debtors filed the First Day Pleadings. The Debtors request that the Court grant the relief requested in the First Day Pleadings, which is critical to ensuring a smooth transition into chapter 11 and stabilizing the Debtors' operations during these Chapter 11 Cases.

51. The First Day Pleadings to be heard at the first day hearing in these Chapter 11 Cases are:

a. *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases, and (II) Granting Related Relief;*

b. *Debtors' Application for Entry of an Order Appointing Stretto, Inc. as Claims and Noticing Agent, Effective as of the Petition Date;*

c. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to File a Consolidated (A) Creditor Matrix and (B) Top 30 Creditors List, (II) Authorizing the Debtors to Redact Certain Personally Identifiable Information of Individuals, (III) Establishing Procedures to Maintain Patient Information as Required by Applicable Privacy Rules, and (IV) Granting Related Relief;*

d. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees; (II) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Obligations; and (III) Granting Related Relief;*

e. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, (B) Continue Employee Benefits Programs, and (C) Pay and Honor Workers' Compensation Obligations; (II) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Obligations; and (III) Granting Related Relief;*

f. *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Prepetition Claims of Critical Vendors, (II) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Obligations, and (III) Granting Related Relief;*

g. *Debtors' Motion for Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief;*

h. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance Policies, (B) Renew, Supplement, Modify, or Purchase Insurance, and (C) Continue Their Insurance Premium Financing Program; (II) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Obligations; and (III) Granting Related Relief;*

i. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, (D) Perform Intercompany Transactions, and (E) Grant Administrative Expense Status to Postpetition Intercompany Claims; (II) Suspending the Time to Comply with 11 U.S.C. § 345(b) and Waiving Certain Operating Guidelines; and (III) Granting Related Relief;*

*j. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Status; (III) Authorizing Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief.*

52. I have reviewed each of the First Day Pleadings (including the exhibits and schedules attached thereto) listed above, and, to the best of my knowledge, I believe that the facts set forth in the First Day Pleadings are true and correct. If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Pleadings.

53. Based on my personal knowledge, information provided to me by members of the Debtors' management and my colleagues who provided services to the Debtors, my review of relevant documents, discussions with the Debtors' advisors, and my experience and knowledge of the Debtors' operations and financial condition, I believe that the relief sought in the First Day Pleadings is necessary to facilitate a smooth transition into chapter 11 and to avoid immediate and irreparable harm to the Debtors' business and estates, and is in the best interests of the Debtors, their estates, their creditors, and other stakeholders.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 6, 2026

/s/ *David R. Campbell*
David R. Campbell
Chief Restructuring Officer (Authorized Agent)
Tapestry Management Services, Inc. *et al.*