**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br>TAPESTRY MANAGEMENT SERVICES, INC., *et al.*,[1]<br>Debtors. | Chapter 11<br>Case No. 26-11777 (TMH)<br>(Jointly Administered) |
| TAPESTRY TELEHEALTH, PLLC, CHESS MEDICINE PLLC, TOPAZ BAY SENIOR HEALTH PC, EMERALD FERN WELLNESS PC, ROSEWOOD HILLS HEALTHCARE PC, CHESS MEDICAL, P.C., and TAPESTRY MEDICAL, P.C.,<br>Plaintiffs,<br>v.<br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary, United States Department of Health and Human Services; DR. MEHMET OZ, in his official capacity as Administrator, Centers for Medicare & Medicaid Services; THE UNITED STATES OF AMERICA; NOVITAS SOLUTIONS, INC.; WISCONSIN PHYSICIANS SERVICE INSURANCE CORP.; PALMETTO GBA, LLC; NORIDIAN HEALTHCARE SOLUTIONS, LLC; FIRST COAST SERVICE OPTIONS, INC.; CGS ADMINISTRATORS, LLC; and NATIONAL GOVERNMENT SERVICES, INC.,<br>Defendants. | Adv. Proc. No. 26-51120 (TMH)<br><br>**Defendants' Resp. Due:**<br>**Nov. 13, 2026 at 5:00 p.m. ET**<br>**Plaintiffs' Reply Due:**<br>**Nov. 16, 2026 at 4:00 p.m. ET** |

**PLAINTIFFS' EMERGENCY MOTION TO ENFORCE THE AUTOMATIC STAY OR, IN THE ALTERNATIVE, FOR ENTRY OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

---

[1]The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are Tapestry Management Services, Inc. (9744), Tapestry Pharmacy Consulting LLC (2776), Chess Medical, P.C. (4399), Chess Medicine PLLC (2119), Emerald Fern Wellness PC (8794), Tapestry Health PLLC (2498), Tapestry Medical, P.C. (9757), Tapestry Medicine PLLC (1329), Tapestry Telehealth PLLC (2399), Topaz Bay Senior Health PC (2183), and Rosewood Hills Healthcare PC (1207) (collectively, the "Debtors"). The location of the Debtors' service address is: 99 Hawley Lane, Suite 1102, Stratford, CT 06614.

Plaintiffs Tapestry Telehealth, PLLC ("Tapestry Telehealth"), Chess Medicine PLLC ("Chess Medicine"), Topaz Bay Senior Health PC ("Topaz Bay"), Emerald Fern Wellness PC ("Emerald Fern"), Rosewood Hills Healthcare PC ("Rosewood Hills"), Chess Medical, P.C. ("Chess Medical"), and Tapestry Medical, P.C. ("Tapestry Medical," and collectively with Tapestry Telehealth, Chess Medicine, Topaz Bay, Emerald Fern, Rosewood Hills, and Chess Medical, "Plaintiffs"), debtors and debtors in possession in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), submit this motion (the "Motion"), pursuant to sections 105(a), 362(a), and 541 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 7001 and 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking entry of an order enforcing the automatic stay or, in the alternative, a temporary restraining order and preliminary injunction, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), against Defendants Robert F. Kennedy, Jr., in his official capacity as Secretary of the United States Department of Health and Human Services ("HHS"); Dr. Mehmet Oz, in his official capacity as Administrator of the Centers for Medicare & Medicaid Services ("CMS"); the United States of America (together with the Secretary and the Administrator, the "Government Defendants"); Novitas Solutions, Inc. ("Novitas"); National Government Services, Inc. ("NGS"); Wisconsin Physicians Service Insurance Corp. ("WPS"); Palmetto GBA, LLC ("Palmetto"); Noridian Healthcare Solutions, LLC ("Noridian"); First Coast Service Options, Inc. ("First Coast"); and CGS Administrators, LLC ("CGS," and together with Novitas, NGS, WPS, Palmetto, Noridian, and First Coast, the "MACs," and the MACs together with the Government Defendants, "Defendants"). In support of the Motion, Plaintiffs rely on the Declaration of Abe Berman, Chief Financial Officer of Tapestry Management Services, Inc. (the "Berman Declaration" or "Berman Decl."), the Declaration of Hans Jenkins, Chief Medical Officer of Tapestry Management

Services, Inc. (the "Jenkins Declaration" or "Jenkins Decl."), the Declaration of Craig Anderson, Chief Executive Officer of Tapestry Management Services, Inc. (the "Anderson Declaration" or "Anderson Decl."), the Declaration of David R. Campbell, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Status; (III) Authorizing Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief [D.I. 42] (the "DIP Declaration" or "DIP Decl."), and the Declaration of David R. Campbell, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings [D.I. 40] (the "First Day Declaration" or "First Day Decl.") and respectfully state as follows:

## PRELIMINARY STATEMENT

1. In *True Health Diagnostics LLC v. Azar (In re THG Holdings LLC)*, 604 B.R. 154 (Bankr. D. Del. 2019), this Court held that a debtor-provider's post-petition Medicare reimbursements are property of the estate; that the Court has jurisdiction to enforce the automatic stay notwithstanding the Medicare Act's exhaustion requirements; that CMS's post-petition withholding to recover pre-petition overpayments violated the stay; that a suspension and ongoing fraud investigation did not trigger the police-power exception; and that the stay is enforceable without satisfying the preliminary injunction factors. The Court ordered CMS to release every dollar withheld post-petition within five business days. That holding logically applies equally to Plaintiffs' post-petition and not-yet-billed reimbursements, which Defendants may not hold as security for a claim they have not asserted. The stay does not halt any investigation; it only prevents Defendants from holding Plaintiffs' money while it proceeds.

2. The stakes here are, if anything, higher than in *True Health*. Plaintiffs are seven medical practices operating under the "TapestryHealth" brand that care for elderly and disabled residents of skilled nursing facilities ("SNFs") who depend on continuous monitoring and coordinated care. Before the Medicare payment suspensions, Plaintiffs served more than 140,000 residents across approximately 1,500 SNFs nationwide, many in rural and underserved communities, helping avoid an estimated 1,000 hospitalizations each month and likely saving Medicare approximately $130 million a year.

3. CMS has cut off the payments that fund that care. Without prior notice, it withheld all Medicare payments to each Plaintiff, but sent notices of suspension only to Tapestry Telehealth, Chess Medicine, Topaz Bay, Emerald Fern, and Chess Medical. Those notices rest on a handful of interviews and complaints concerning a small fraction of the patients of the practices that received a notice.

4. ***Importantly, CMS has not found that any patient was harmed or that any overpayment exists; it says only that "additional investigation is warranted."*** Rosewood Hills alone has not even received a notice. CMS continues to process Plaintiffs' claims and to let Plaintiffs treat Medicare beneficiaries. Anderson Decl. ¶ 6 & Exs. A–E. What it will not do is pay. CMS is holding all money owed for services already rendered as security for hypothetical, unliquidated pre-petition overpayment claims it may later assert (the "Hypothetical Overpayment Claims"), which CMS has never made or quantified and does not expect to assert until the conclusion of an investigation of indefinite duration.

5. Plaintiffs therefore ask the Court to do what it did in *True Health*. Any further withholding of Medicare reimbursement after November 6, 2026 (the "Petition Date") would irreversibly jeopardize Plaintiffs' ability to avoid liquidation. Plaintiffs ask the Court to enter an

order enforcing the automatic stay by enjoining Defendants from reversing, suspending, escrowing, recouping, setting off, or otherwise withholding payment for claims for Medicare services rendered on or after the Petition Date (the "Post-Petition Reimbursements"), and requiring Defendants to process and pay, in the ordinary course, Plaintiffs' claims for Medicare services rendered before the Petition Date for which no claim had been submitted as of the Petition Date (collectively, the "Unbilled Reimbursements," together with claims that were denied and are being held for resubmission because of the suspensions and the Post-Petition Reimbursements, the "Post-Petition Amounts").

6. Plaintiffs need not satisfy the traditional preliminary injunction factors. The automatic stay is self-executing, and under *True Health*, a debtor that shows the withheld Medicare payments are estate property and that no stay exception applies is entitled to relief.

7. But each preliminary injunction factor is met. *First*, Plaintiffs are likely to succeed on the merits because this case follows this Court's decision in *True Health*. The Court has jurisdiction because this Motion does not challenge the suspensions or any future fraud or overpayment determination; it asks only that the Court enforce the automatic stay against post-petition withholding, as binding Third Circuit precedent permits. Because the Post-Petition Amounts are estate property, withholding them violates the stay in four independent ways, and the police-power exception under 11 U.S.C. § 362(b)(4) does not apply where, as here, Defendants seek only to protect the government's pecuniary interest.

8. Indeed, every fact confirms that CMS is acting as a collector, not a regulator. Plaintiffs answered each suspension on the merits and offered prepayment review, claims-level review, and a partial suspension. CMS rejected them all, refused to meet, and disclaimed any "authority" even to consider the hardship it was causing. After Plaintiffs warned that the

suspensions were driving them toward chapter 11, CMS withheld payments to Rosewood Hills without notice. CMS also withheld payments to Chess Medical before the Chess Medical Notice issued. A regulator explains its action. A collector holds the debtor's property as security for an amount it hopes to recover, just as CMS is attempting here.

9. *Second*, the harm is irreparable and ongoing. The TapestryHealth network has cut its full-time workforce from approximately 500 to approximately 100 and, since August 1, 2026, cut services for approximately 49,939 patients. Without the withheld payments, Plaintiffs cannot fund payroll (regardless of any financing condition) and cannot satisfy milestones that are a necessary part of the proposed debtor-in-possession financing. That financing is critical to funding these Chapter 11 Cases. Simply put, absent the relief requested herein, the Debtors will be forced into a textbook "fire sale" liquidation that destroys value for creditors and ends care that no later release of funds can restore.

10. *Third*, the equities favor Plaintiffs because Defendants lose nothing to which they are entitled. As in *True Health*, any overpayment CMS may someday determine would be an unliquidated pre-petition claim pursued through the claims process, and CMS remains free to review and, where appropriate, deny any post-petition claim and to complete its investigation.

11. *Fourth*, the public interest, which favors reorganization over liquidation and continuity of patient care, weighs decisively in Plaintiffs' favor.

12. The Court should do here what it did in *True Health* and grant the Motion.

## JURISDICTION AND VENUE

13. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012, as set forth more fully in Part I *infra*. This is a core

proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (E), (G), (M), and (O). Venue is proper pursuant to 28 U.S.C. § 1409(a). Pursuant to 11 U.S.C. § 106(a), sovereign immunity is abrogated as to the Government Defendants with respect to sections 105, 362, 363, 502, 506, 542, 549, 550, and 553 of the Bankruptcy Code.

14. Pursuant to Bankruptcy Rule 7008 and Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), Plaintiffs consent to the entry of final orders or judgments by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## STATEMENT OF FACTS

### A. Plaintiffs Provide Essential Care to Medically Fragile Patients

15. Tapestry Management Services, Inc. ("TapestryHealth") provides management and administrative services to Plaintiffs and other affiliated practices, each of which bills Medicare for the services it furnishes (other than Tapestry Medical, whose Medicare enrollment has not been completed). Berman Decl. ¶ 1; Anderson Decl. ¶ 5; Jenkins Decl. ¶ 7. Through their physicians and other licensed practitioners, Plaintiffs furnish chronic care management ("CCM"), behavioral health integration ("BHI"), remote physiologic monitoring ("RPM"), and other clinical services to SNF residents, supported by continuous in-room monitoring and daily risk reporting integrated with facility medical records. First Day Decl. ¶¶ 8, 10. Partner facilities report that these services identify changing conditions early and materially reduce hospitalizations; at one facility, for example, the rehospitalization rate fell from more than 30% to approximately 2%. First Day Decl. ¶ 11.

16. Medicare reimbursement constitutes approximately 60% of Tapestry Telehealth's revenue and approximately 75% of Chess Medicine's revenue, and Medicare accounts for approximately 83% of Chess Medical's revenue and substantially all of Topaz Bay's, Emerald Fern's, and Rosewood Hills' revenue. Berman Decl. ¶ 7. Substantially all of each Plaintiff's receipts are collected through the Debtors' centralized cash management system, which funds payroll and operating expenses; Plaintiffs do not separately retain operating cash. Berman Decl. ¶ 8.

17. Plaintiffs bill Medicare in the ordinary course. Anderson Decl. ¶ 14. Medicare permits claims to be submitted up to one year after the date of service. 42 C.F.R. § 424.44(a). As of November 5, 2026, Plaintiffs had furnished Medicare services that had not yet been billed, with total charges of approximately $50.7 million and an expected Medicare payment amount of approximately $18.4 million: approximately $26.1 million ($9.2 million expected payment) for Tapestry Telehealth, $11.5 million ($4.2 million) for Rosewood Hills, $6.1 million ($2.4 million) for Tapestry Medical, $5.5 million ($1.9 million) for Emerald Fern, $1.1 million ($461,000) for Chess Medicine, and $406,000 ($161,000) for Chess Medical. Expected Medicare payments are calculated on a claim-by-claim basis from the Medicare allowed amount for each CPT code billed, using the Medicare fee schedule for the specific state and locality in which the service was furnished, and then applying a collection percentage based on the rendering practitioner's specialty: for services furnished by physicians (MD/DO), 78% of the allowed amount (Medicare's 80% payment share less 2% sequestration); and for services furnished by nurse practitioners, 78% of 85% of the allowed amount, reflecting Medicare's payment of nurse practitioner services at 85% of the physician fee schedule amount (the "Reimbursement Methodology"). Berman Decl. ¶ 11.

18. In addition, Plaintiffs held for resubmission pre-petition claims denied because of the suspensions, with total charges of approximately $3.6 million and an expected Medicare payment amount of approximately $1.3 million: approximately $2.3 million in charges ($812,000 expected payment) for Tapestry Telehealth, $378,000 ($137,000) for Topaz Bay, $338,000 ($118,000) for Emerald Fern, $411,000 ($157,000) for Chess Medical, $160,000 ($53,000) for Rosewood Hills, and $27,000 ($11,000) for Chess Medicine. Berman Decl. ¶ 11.

B. **Medicare Payment Suspensions Are Meant to Be Temporary and May Be Partial**

19. Federal regulations permit CMS to suspend Medicare payments "in whole or in part" where a credible allegation of fraud exists, unless there is good cause not to suspend. 42 C.F.R. § 405.371(a)(1)–(2). With exceptions not applicable here, a suspension is permitted only "after [CMS or the Medicare contractor] has complied with the procedural requirements set forth at § 405.372." *Id.* § 405.371(c)(1). A provider may submit a rebuttal, which CMS must consider and resolve within fifteen days; that determination is not appealable. 42 C.F.R. §§ 405.372(b)(2), 405.375(a), (c). While a suspension is in effect, claims continue to be processed, but payment on approved claims is withheld; when the suspension is lifted, the withheld funds are "first applied to reduce or eliminate any overpayments." *Id.* § 405.372(e). Until a final overpayment determination is issued, no administrative appeal is available. 42 C.F.R. § 405.375(c).

C. **CMS Withholds 100% of Plaintiffs' Medicare Payments on a Thin Record**

20. For approximately nine months, CMS has acted to withhold all Medicare payments from Plaintiffs, in each case without prior notice and, in some cases, with no notice at all. Jenkins Decl. ¶ 7; Anderson Decl. ¶ 6 & Exs. A–E; First Day Decl. ¶¶ 31, 33–34. CMS first suspended Topaz Bay effective January 16, 2026, but did not issue the Topaz Notice until February 19, 2026. Anderson Decl. Ex. C. Nearly seven months later, CMS suspended, in quick succession, Tapestry

Telehealth effective August 11, 2026 (the “Tapestry Notice”) and Chess Medicine effective August 13, 2026 (the “Chess Notice”). Anderson Decl. Ex. A; Anderson Decl. Ex. B. Tapestry Telehealth’s counsel was first informed of the Tapestry Telehealth suspension by telephone.. First Day Decl. ¶ 33. Finally, on October 15, 2026, CMS issued a notice to Emerald Fern (the “Emerald Fern Notice”) imposing a full suspension effective October 6, 2026. Anderson Decl. Ex. D. On November 4, 2026, CMS issued the Chess Medical Notice, which states that Chess Medical’s suspension was effective October 8, 2026—nearly four weeks before the notice issued—and that notice was delivered two days before the Petition Date. Anderson Decl. Ex. E. The Notices are the Topaz Notice, the Tapestry Notice, the Chess Notice, the Emerald Fern Notice, and the Chess Medical Notice. Anderson Decl. ¶ 6 & Exs. A–E. In addition, on information and belief, CMS has withheld all Medicare payments to Rosewood Hills (starting on or about October 9, 2026), although Rosewood Hills alone has not received a notice of suspension. First Day Decl. ¶ 34.

21. The Notices rest on remarkably little. Anderson Decl. ¶ 6 & Exs. A–E. Each cites a handful of beneficiary interviews or complaints and identifies only a few claims: four for Topaz Bay (Anderson Decl. Ex. C); eight for Tapestry Telehealth out of ninety-one otherwise unidentified complaints (Anderson Decl. Ex. A); five for Chess Medicine (Anderson Decl. Ex. B); for Emerald Fern, a single beneficiary complaint, two interviews, and a site visit to one Dallas location (Anderson Decl. Ex. D); and, for Chess Medical, seventeen beneficiary complaints received between March 16 and September 29, 2026, generalized billing-volume and billed-time assertions, and a July 2024 education notice, supported by only nine example claims (Anderson Decl. Ex. E). Measured over July 2025 through July 2026, the cited complaints concern approximately 0.09 percent of Tapestry Telehealth’s 104,329 unique traditional Medicare patients (Anderson Decl. Ex. A); the thirty-eight beneficiaries underlying the Chess Medicine suspension

represent approximately 0.6 percent of its 6,638 patients (Anderson Decl. Ex. B); and the beneficiaries underlying the Topaz Bay and Emerald Fern suspensions each represent approximately 0.04 percent of those practices' 14,869 and 8,408 patients, respectively (Anderson Decl. Ex. C; Anderson Decl. Ex. D). CMS has never identified the claims underlying the remaining complaints. Anderson Decl. ¶ 6 & Exs. A–E. The Topaz Notice's only other ground—an increase in billing volume—reflected the timing of Topaz Bay's enrollment in Medicare and its joinder to TapestryHealth's credit agreement, which delayed its first claim submission until January 2026, when it submitted at once its claims for all services provided since September 2025. Anderson Decl. Ex. C; Anderson Decl. ¶ 9. Yet each suspension withholds 100% of payments nationwide (Anderson Decl. ¶ 6 & Exs. A–E).

22. The Notices are candid about their purpose: to protect CMS's ability to collect. Anderson Decl. ¶ 6 & Exs. A–E. The Tapestry Notice explains that prior notice was withheld because it "would place additional Medicare funds at risk and hinder CMS' ability to recover any determined overpayment," and that withheld funds "shall be applied first to reduce or eliminate any overpayment." Anderson Decl. Ex. A at 2, 5. Each Notice states that the suspension "will last until resolution of the ongoing investigation" and that "[c]laims will continue to be processed during the suspension period." Anderson Decl. ¶ 6 & Exs. A–E.

### D. Plaintiffs Respond and Offer Alternatives; CMS Refuses Them All

23. Plaintiffs answered each suspension notice they received on the merits. Anderson Decl. ¶¶ 7–9. Topaz Bay submitted a rebuttal on March 9, 2026 addressing each identified claim; CMS nonetheless maintained the suspension. First Day Decl. ¶ 31. On August 25, 2026, Tapestry Telehealth rebutted each of the eight identified claims with contemporaneous monthly reports, underlying system data, and audit logs. Anderson Decl. ¶ 7. Notably, every claim CMS identified

as to Tapestry Telehealth has a 2025 date of service, while the payments CMS is now withholding are for 2026 services that CMS has never questioned. Anderson Decl. Ex. A at 3. And Tapestry Telehealth had already identified and refunded one of those claims through its own compliance program—months before CMS suspended every payment. Anderson Decl. ¶ 7. SGS, the Northeastern Unified Program Integrity Contractor, acknowledged the rebuttal on August 26, 2026, but issued no determination within the fifteen days that 42 C.F.R. § 405.375(a) requires. First Day Decl. ¶ 37.

24. Plaintiffs also offered alternatives. Tapestry Telehealth offered claims-level and prepayment review, and Chess Medicine offered prepayment or claims-level review, expedited production of records, and post-payment audits. Anderson Decl. ¶¶ 7–8. On September 16 and 17, 2026, Tapestry Telehealth and Chess Medicine asked CMS to limit the suspensions to 26% of Medicare reimbursement. Anderson Decl. ¶¶ 7–8.

25. CMS refused all of these offers and declined Tapestry Telehealth's request for a meeting. First Day Decl. ¶ 39. Its September 21, 2026 rebuttal determination states that the suspension "will remain in place until the completion of the investigation"; denies the hardship request because payment suspension guidance "does not include authority for CMS to consider a request for relief from a payment suspension due to financial hardship"; and concludes: "This determination is not appealable." First Day Decl. ¶¶ 37, 39. It identifies no patient-safety concern, and no overpayment has been determined. Anderson Decl. ¶ 12; First Day Decl. ¶ 40. On September 28, 2026, CMS advised that the suspensions "will remain in place until DOJ has concluded its investigation," and directed all further inquiries to DOJ. First Day Decl. ¶ 39. DOJ, for its part, has indicated that the suspensions are a matter for Plaintiffs to challenge with CMS. First Day Decl. ¶ 39.

26. To date, no Defendant has issued an overpayment determination, initiated recoupment (other than the payment reversals described in the Berman Declaration), or commenced revocation or exclusion proceedings, and Plaintiffs continue to treat Medicare beneficiaries. First Day Decl. ¶ 40; Anderson Decl. ¶ 11; Berman Decl. ¶ 10. Topaz Bay's suspension has now been in place for approximately nine months. First Day Decl. ¶ 31. DOJ has issued civil investigative demands to certain of the Debtors, but no overpayment has been determined, and no claim has been denied on the basis of the allegations underlying the suspensions. Anderson Decl. ¶ 13; First Day Decl. ¶ 40.

E. **Plaintiffs Disclose Their Financial Condition, and Further Suspensions Follow**

27. Plaintiffs kept Defendants informed of the suspensions' effect on their finances and their patients throughout this period. Tapestry Telehealth requested hardship relief, and TapestryHealth's Chief Financial Officer submitted declarations dated August 24, 2026 and September 16, 2026 in support of Tapestry Telehealth's and Chess Medicine's rebuttal statements, respectively, describing the financial effect of the suspensions. Berman Decl. ¶ 15. Thereafter, CMS issued the Emerald Fern Notice. Anderson Decl. Ex. D. On information and belief, payments to Rosewood Hills were suspended without notice while Chess Medical's payments were withheld before the Chess Medical Notice issued. First Day Decl. ¶ 34; Anderson Decl. Ex. E.

F. **The Suspensions Harm Patients and Force Plaintiffs Into Chapter 11**

28. The suspensions cut off the revenue that pays Plaintiffs' clinicians. Berman Decl. ¶ 6. Before the suspensions, TapestryHealth incurred approximately $4.3 million in average weekly operating expenses, including approximately $2.3 million in payroll and employee-related obligations. Berman Decl. ¶ 5. As a result of the suspensions, by mid-September 2026, Tapestry Telehealth had discontinued CCM and BHI services for approximately 24,000 patients and RPM

services for approximately 11,000 patients, TapestryHealth had furloughed 54 of the approximately 1,863 personnel across its network and had approximately $1.44 million in unrestricted cash. TapestryHealth also deferred vendor payments. Anderson Decl. ¶ 16. The cuts have since deepened: measured between August and October 2026, services have been cut for approximately 50,000 patients across Plaintiffs' practices, and the network's full-time workforce has fallen from approximately 500 to approximately 108. First Day Decl. ¶¶ 41–42. By October 14, 2026, the Debtors' available cash had fallen to approximately $520,000. As of the Petition Date, TapestryHealth and Plaintiffs had approximately $0.4 million in unrestricted cash and, absent restored Medicare reimbursements and further advances under the debtor-in-possession financing, will exhaust available liquidity by approximately November 20, 2026. Berman Decl. ¶ 16.

29. The Debtors have negotiated limited debtor-in-possession financing (the "DIP Financing") to be provided by LAGO Evergreen Credit and LAGO Innovation Fund III, LLC (together, the "DIP Lender") pursuant to the conditions set forth in a term sheet (the "DIP Term Sheet") attached to the interim order approving the DIP Financing. [Ch. 11 Case Docket No. 59]. The DIP Financing includes milestones tied to the relief requested in this Motion, including entry of an order by November 17, 2026. First Day Decl. ¶ 49. If that milestone is not met, the approved budget may be replaced, in accordance with the DIP Term Sheet, by a reduced realignment budget, and the Debtors will be required to pursue a compressed sale process. Independently of the DIP Financing, the Debtors' cash projections show that, absent the relief requested, they will lack sufficient cash to fund payroll and operations by approximately November 20, 2026. DIP Decl. ¶ 16; Berman Decl. ¶¶ 16–17.

## LEGAL STANDARD

30. The Court may issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). Bankruptcy Rule 7065 makes Federal Rule of Civil Procedure 65 applicable in adversary proceedings and provides that a temporary restraining order or preliminary injunction may issue on application of a debtor in possession without compliance with Rule 65(c). Fed. R. Bankr. P. 7065.

31. As shown below, a debtor that merely seeks to enforce the automatic stay need not satisfy the traditional preliminary injunction standard because the stay is self-executing. *True Health*, 604 B.R. at 162. Where the traditional preliminary injunction standard applies, the Court considers "(1) a likelihood of success on the merits; (2) a greater-than-even chance of irreparable harm without a preliminary injunction; (3) a favorable balance of equities; and (4) the public interest favoring the injunction." *Heartland Payment Sys., LLC v. Volrath*, 762 F. App'x 95, 98 (3d Cir. 2019); *see Reilly v. City of Harrisburg*, 858 F.3d 173, 176–79 (3d Cir. 2017). The first two factors are the "most critical." *Reilly*, 858 F.3d at 179. The movant must show that it "can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Id.* The same standard governs a temporary restraining order. *In re Advanced Mktg. Servs.*, 360 B.R. 421, 426 (Bankr. D. Del. 2007).

## ARGUMENT

### I. The Court Has Jurisdiction to Enforce the Automatic Stay.

32. This Court has already decided the jurisdictional question this Motion presents. In *True Health*, the Court rejected the government's arguments that the Court lacked subject-matter jurisdiction and held that the Court "ha[d] jurisdiction under 28 U.S.C. §§ 157 and 1334." 604

B.R. at 158–59. The Court reasoned that, while challenges to "the appropriateness of the overpayment determinations" would be channeled through the administrative process, the issue before it was "the narrow question of whether the Defendants are in violation of the automatic stay by continuing to withhold Medicare payments post-petition." *Id.* at 159. Because that question was not "inextricably intertwined with pre-petition fiscal reimbursement determinations," the Court could decide it, while the administrative process would determine "the amount, if any," of any overpayment. *Id.* at 159–60.

33. *True Health* in turn rested on the Third Circuit's decision in *University Medical Center*, which "addressed this very issue extensively." *Id.* at 159 (citing *In re Univ. Med. Ctr.*, 973 F.2d 1065, 1073–74 (3d Cir. 1992)). There, the Third Circuit held that "where there is an independent basis for bankruptcy court jurisdiction, exhaustion of administrative remedies pursuant to other jurisdictional statutes is not required," because a withholding dispute raised through the debtor's claim that the withholding violated the automatic stay "arose under the Bankruptcy Code and not the Medicare Act." *Id.* (citation omitted). Exercising jurisdiction "does not impinge upon this authority of the Secretary protected by section 405(h)," because "there is no system of administrative review in place to address the issues raised" by a stay-enforcement proceeding. *True Health*, 604 B.R. at 159 (quoting *Univ. Med. Ctr.*, 973 F.2d at 1073). So too here: Plaintiffs' claims exist only because Plaintiffs are chapter 11 debtors, arise under sections 362 and 541 of the Bankruptcy Code, and cannot be adjudicated in any Medicare administrative process.

34. The District Court agreed, denying the government's motion for a stay pending appeal because, under *University Medical Center*, "the Bankruptcy Code provides an independent basis for a bankruptcy court to exercise jurisdiction to decide the precise issue in this case—whether the automatic stay under section 362(a) prohibits the withholding of Medicare payments

to a healthcare provider in bankruptcy." *In re THG Holdings LLC*, Civ. No. 19-2215 (RGA), 2019 WL 6615341, at *4 (D. Del. Dec. 5, 2019).

35. Nor do the Medicare Act's exhaustion requirements apply. Section 405(h) of the Social Security Act, made applicable to Medicare by 42 U.S.C. § 1395ii, channels claims "arising under" the Medicare Act; it does not reach claims that arise under the Bankruptcy Code and that no administrative process can hear, such as claims to enforce the automatic stay. *Univ. Med. Ctr.*, 973 F.2d at 1073–74; *True Health*, 604 B.R. at 158–60. Nor is there any administrative remedy to exhaust: its rebuttal determination "is not appealable," and absent an overpayment determination no administrative appeal is available. *See* First Day Decl. ¶ 39; 42 C.F.R. § 405.375(c). Plaintiffs do not challenge the suspensions, any credible-allegation-of-fraud finding, or any future overpayment determination, or ask the Court to decide whether any claim is payable; those questions remain with the agency. *True Health*, 604 B.R. at 158–60. Because no administrative process exists to hear the narrow stay-enforcement question this Motion presents, that question cannot be inextricably intertwined with any determination committed to the agency.

36. Even if an administrative process existed, exhaustion is excused where the remedy is inadequate, including where a litigant faces irreparable harm from "an unreasonable or indefinite timeframe for administrative action," the agency cannot grant effective relief, or the agency has predetermined the issue. *See McCarthy v. Madigan*, 503 U.S. 140, 147 (1992), *superseded by statute on other grounds*; *see also Coit Indep. Joint Venture v. FSLIC*, 489 U.S. 561, 587 (1989) ("The lack of a reasonable time limit in the current administrative claims procedure renders it inadequate . . . ."). Each circumstance is present: the suspensions have no end date. Anderson Decl. ¶ 6 & Exs. A–E. CMS and DOJ have each disclaimed responsibility for communicating with Plaintiffs, and CMS has declared that the suspensions will continue until DOJ finishes, knowing

that Plaintiffs are on the verge of collapse. First Day Decl. ¶ 39. Exhaustion would be futile. *See Cerro Metal Prods. v. Marshall*, 620 F.2d 964, 971 n.17 (3d Cir. 1980) (excusing exhaustion where the "prescribed administrative procedure is clearly shown to be inadequate to prevent irreparable injury" (citations omitted)).

## II. The Automatic Stay Applies and Has Been Violated.

### A. The Post-Petition Amounts Are Property of Plaintiffs' Estates.

37. Medicare reimbursements are property of the estate. The bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Section 541 "was intended to sweep broadly," such that "the mere opportunity to receive an economic benefit in the future is property with value under the Bankruptcy Code." *In re Majestic Star Casino, LLC*, 716 F.3d 736, 750–51 (3d Cir. 2013). In *True Health*, this Court held that Medicare reimbursements are "indisputably property of the estate," because they "are merely postponed payments that [the debtor] expects to receive." 604 B.R. at 160–61.

38. Here too, the Post-Petition Amounts are property of the estate. They are Plaintiffs' rights to payment post-petition for Medicare services Plaintiffs have furnished and continue to furnish to beneficiaries, including as debtors in possession. Those rights existed "as of the commencement of the case" or arose thereafter as proceeds and post-petition earnings of the estate. 11 U.S.C. § 541(a)(1), (6)–(7); *Majestic Star*, 716 F.3d at 750–51 (estate includes interests that are "contingent, or because enjoyment must be postponed"); *True Health*, 604 B.R. at 160–61; Jenkins Decl. ¶ 5.

39. The Unbilled Reimbursements are Plaintiffs' rights to payment on claims submitted after the Petition Date for pre-petition services, and those rights are likewise estate property. Plaintiffs will submit those claims in the ordinary course, CMS and the MACs will review every one, and Plaintiffs ask only to be paid on approved claims rather than have them withheld as

security for the Hypothetical Overpayment Claims. Anderson Decl. ¶ 14. As this Court ruled from the bench in *True Health*, as quoted by the District Court, "[e]very time an invoice was submitted for payment, the Government made the determination not to pay that invoice. That is action post-petition." 2019 WL 6615341, at *4 (quoting Hr'g Tr. at 76:5–12 (Nov. 26, 2019)). Each refusal to pay a claim submitted after the Petition Date on account of CMS's pre-petition allegations is likewise a post-petition act against estate property.

40. Plaintiffs' Medicare Participating Physician or Supplier Agreements (Form CMS-460) (the "Provider Agreements") confirm that conclusion. Plaintiffs agreed to accept assignment—meaning "requesting direct Part B payment from the Medicare program"—for "all services for which the participant is eligible to accept assignment under the Medicare law and regulations and which are furnished while this agreement is in effect," and not to collect from beneficiaries more than the applicable deductible and coinsurance. Form CMS-460 at 1. In exchange, once the MAC determines the approved charge for a covered service, Plaintiffs are entitled to "direct and timely reimbursement from Medicare." *Id.* at 2.

41. The Medicare statutes likewise give an enrolled Part B participant "the right to bill Medicare directly and receive prompt payment for services rendered to Medicare beneficiaries." *In re IHN Podiatry Servs., PLLC*, 678 B.R. 445, 452 (Bankr. M.D. Fla. 2026); *see* 42 U.S.C. § 1395u(b)(3)(B), (b)(6), (h). That right does not lapse when services are rendered: a supplier may bill up to one year after the date of service, 42 U.S.C. § 1395u(b)(3)(B); 42 C.F.R. § 424.44, after which the MAC must "[d]etermine any amounts payable and make payment accordingly," 42 C.F.R. § 405.920, and must pay at least 95 percent of "clean claims" within 30 days, 42 U.S.C. § 1395u(c)(2).

42. Plaintiffs' rights to payment under the Provider Agreements are thus estate property, even though the amount ultimately payable remains subject to Medicare's requirements. *See In re Psychotherapy & Counseling Ctr.*, 195 B.R. 522, 532 (Bankr. D.D.C. 1996) (holding "the debtor's rights under the provider agreements to participate in the Medicaid and Medicare provider reimbursement program are properly considered property of the estate"); *True Health*, 604 B.R. at 160–61; *In re Healthback, L.L.C.*, 226 B.R. 464, 470 n.4 (Bankr. W.D. Okla. 1998) ("[a]ny debts owing to the estate, such as reimbursements due from [HHS], would be property of the estate, regardless of the payment procedures employed"), *vacated on other grounds*, No. 97-22616-BH, 1999 WL 35012949 (Bankr. W.D. Okla. May 28, 1999).

### B. Defendants' Post-Petition Withholding Violates Sections 362(a)(1), (3), (6), and (7).

43. The automatic stay "is one of the fundamental debtor protections supplied by the Bankruptcy Code." *Univ. Med. Ctr.*, 973 F.2d at 1074. It gives the debtor a breathing spell and protects the estate by "preventing particular creditors from acting unilaterally in self-interest to obtain payment from a debtor to the detriment of other creditors." *Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991). The stay applies to "all entities," including governmental units, unless an exception applies. 11 U.S.C. §§ 101(15), 362(a); *Penn Terra Ltd. v. Dep't of Envtl. Res.*, 733 F.2d 267, 272 (3d Cir. 1984); *Univ. Med. Ctr.*, 973 F.2d at 1074 ("Congress subjected the government, acting as a creditor, to the limitations of the automatic stay.").

44. Defendants' post-petition suspension and withholding of the Post-Petition Amounts violates the stay in four independent ways. It is (a) the continuation of an "action or proceeding against the debtor . . . to recover a claim against the debtor that arose before the commencement of the case," 11 U.S.C. § 362(a)(1); (b) an "act to obtain possession of property of the estate . . .

or to exercise control over property of the estate," *id.* § 362(a)(3); (c) an "act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case," *id.* § 362(a)(6); and (d) the "setoff of any debt owing to the debtor that arose before the commencement of the case . . . against any claim against the debtor," *id.* § 362(a)(7). This Court entered findings on each of the first three grounds in *True Health*, 604 B.R. at 163 (Order ¶¶ E–G). And the Third Circuit has held that section 553 does not permit pre-petition overpayments to be set off against the government's obligation to pay for post-petition services. *Univ. Med. Ctr.*, 973 F.2d at 1079; *accord In re Tidewater Mem'l Hosp.*, 106 B.R. 876, 882 (Bankr. E.D. Va. 1989); *In re Mem'l Hosp. of Iowa Cnty., Inc.*, 82 B.R. 478, 480 (Bankr. W.D. Wis. 1988).

C. **The Police and Regulatory Power Exception Does Not Apply.**

45. The Court should not credit any attempt by Defendants to exempt themselves from the stay based on references to fraud-prevention. While section 362(b)(4) exempts from the automatic stay actions "to enforce such governmental unit's or organization's police and regulatory power," 11 U.S.C. § 362(b)(4), the exception is construed narrowly. *In re Fairchild Corp.*, No. 09-10899 (CSS), 2009 WL 4546581, at *3 (Bankr. D. Del. Dec. 1, 2009). It is intended to prevent debtors from evading governmental efforts "to enjoin or deter ongoing debtor conduct which would seriously threaten the public safety and welfare." *True Health*, 604 B.R. at 162 (quoting *In re Nortel Networks, Inc.*, 669 F.3d 128, 137 (3d Cir. 2011)). That is not the case here.

46. The exception is also limited by its terms. Section 362(b)(4) excepts governmental action only from the stays imposed by section 362(a)(1), (2), (3), and (6), and, as to judgments, extends only to "the enforcement of a judgment other than a money judgment." 11 U.S.C. § 362(b)(4). It does not reach section 362(a)(7) at all, so it cannot excuse a setoff. And it does not

permit the government to collect money. Holding a debtor's cash as security for an unliquidated claim, as Defendants are doing here, is collection, not regulation.

47. Courts draw a clear line between policing and collection. Policing is the government acting to stop conduct that is injurious to the public. *See Penn Terra*, 733 F.2d at 278 (compelling a debtor to remediate a hazardous site even though compliance costs money); *In re Bayou Shores SNF, LLC*, 525 B.R. 160, 172 (Bankr. M.D. Fla. 2014), *rev'd on other grounds*, 533 B.R. 337 (M.D. Fla. 2015), *aff'd*, 828 F.3d 1297 (11th Cir. 2016) (refusing to renew a nursing home's license in order to close a facility the State believes endangers its residents). Collection is the government holding money. *Bayou Shores* is instructive precisely because it drew that line between two agencies acting with respect to the same skilled nursing facility. The Court held that the State's license revocation or denial was policing, but CMS's decision to terminate the facility's Medicare provider agreement was *not*, because CMS "made no attempt to shut down the Debtor's facility. As far as HHS was concerned, the Debtor could continue to operate its facility and provide care for its patients; HHS simply was not going to pay for it." *Id.* at 171–72. If termination of a provider agreement was not policing in *Bayou Shores*, a payment suspension that leaves Plaintiffs enrolled, treating patients, and submitting claims that CMS continues to process and approve cannot be policing as a matter of law.[2] Anderson Decl. ¶ 6 & Exs. A–E; Anderson Decl. ¶ 14.

48. To evaluate whether government action falls within the narrow police power exception, courts apply two overlapping tests. *First*, the pecuniary purpose test asks whether the government "primarily seeks to protect a pecuniary governmental interest in the debtor's property, as opposed to protecting the public safety and health." *Nortel*, 669 F.3d at 139–40. *Second*, the

[2] The district court reversed, and the Eleventh Circuit affirmed, on jurisdictional grounds, holding that section 405(h) barred bankruptcy jurisdiction and required the debtor to exhaust its Medicare administrative remedies—a holding contrary to *University Medical Center*, which governs here. The Eleventh Circuit expressly declined to reach whether HHS's actions fell within section 362's exceptions. 828 F.3d at 1322 n.46.

public policy test asks whether the government is effectuating public policy rather than adjudicating private rights. *Id.* If the government acts to protect a "pecuniary interest in the debtor's property or primarily to adjudicate private rights, then the exception is inapplicable." *Id.* at 140. "The purpose of these tests is to get to the heart of the reasoning behind the government's actions to avoid relying on unsupported statements of intent." *True Health*, 604 B.R. at 162.

49. Consistent with the narrow purpose of the exception, courts in the Third Circuit recognize that withholding a debtor's funds to set them off against a claim for overpayments is the function of a debt collector, not a police function. The Third Circuit has held that HHS's withholding of a provider's Medicare payments "certainly did not fall within this police power exception to the stay." *Univ. Med. Ctr.*, 973 F.2d at 1075. Similarly, in *True Health*, this Court found nothing in the record suggesting that CMS's withholding was "for any purpose other than protecting its pecuniary interest in property of the estate," and gave "no weight" to unsupported assertions that further fraud was under investigation. 604 B.R. at 160, 162. And CMS in *True Health* had at least issued overpayment determinations based on fraud—totaling more than $27 million—before the petition date. *Id.* at 158. Here, CMS has made no determinations at all. First Day Decl. ¶ 40. In *Medicar*, the court held that even a suspension premised on reliable evidence of misrepresented services and altered medical records satisfied neither test, because allowing it to continue post-petition meant that "reorganization would be jeopardized" and "maximum value could not be obtained for the collective creditor body." *In re Medicar Ambulance Co.*, 166 B.R. 918, 925–27 (Bankr. N.D. Cal. 1994). The record here compels the same conclusion.

50. *First*, CMS has not issued notices of suspension to Rosewood Hills at all. First Day Decl. ¶ 34. As to the others, its identification of potential issues is not a finding of fraud, much less ongoing post-petition fraud.

51. *Second*, Plaintiffs offered every tool a regulator concerned with program integrity could want—a limited suspension, targeted prepayment review, claims-level review protocols, expedited documentation, and post-payment audits—and later proposed a suspension limited to 26% of reimbursement. Anderson Decl. ¶¶ 7–8. CMS rejected every alternative and declined to meet. First Day Decl. ¶ 39. If CMS's purpose were to prevent payment on improper claims, prepayment review would fully serve it. The only interest a total suspension serves that prepayment review does not is the accumulation of a fund against which to apply a future overpayment—as the Tapestry Notice confirms, explaining that prior notice was withheld because it would "hinder CMS' ability to recover any determined overpayment," and that withheld funds "shall be applied first to reduce or eliminate any overpayment." Anderson Decl. Ex. A at 2, 5; *see* 42 C.F.R. § 405.372(e). That is "the exact conduct that the pecuniary interest test was designed to prohibit." *True Health*, 604 B.R. at 162.

52. Nor does a payment suspension further any effort to adjudicate or deter ongoing misconduct. Defendants have *not* sought revocation, exclusion, or termination; they continue to let Plaintiffs treat Medicare beneficiaries. First Day Decl. ¶ 40. The suspensions thus determine only who holds the money in the meantime and to which debts it is applied first. In *True Health*, CMS likewise had imposed a new 100% suspension, based on purported credible allegations of fraud, weeks before the petition date, and this Court held that the post-petition withholding served only CMS's pecuniary interest. 604 B.R. at 158, 162. Nor would the requested relief impede any investigation: the Proposed Order does not touch DOJ's investigation, its civil investigative demands, any False Claims Act action, or CMS's review of any claim. The stay changes only whether Defendants may hold Plaintiffs' money as security for the unliquidated Hypothetical Overpayment Claims while they proceed.

53. An ongoing investigation does not transform withholding into policing. In *Borrego Community Health Foundation v. California Department of Health Care Services*, the State suspended all Medi-Cal payments to a debtor-provider while a fraud investigation into its prior services remained open. Findings of Fact & Conclusions of Law ¶ 5, No. 22-90056-LT, D.I. 65 (Bankr. S.D. Cal. Oct. 26, 2022). The court held that the stay barred the suspension, finding the State's patient-care concerns "pretextual" where its cited grievances amounted to a 0.27% grievance rate, and finding that the State "provided no evidence of currently existing fraud, but rather cited the ongoing investigation into the prior fraud to justify the Payment Suspension." *Id.* ¶¶ 10, 14–17. So too here: the suspensions rest on a minuscule fraction of Plaintiffs' claims, the issues identified concern documentation and coding rather than any threat to patients, and Defendants identify no currently existing fraud. Because CMS's own notices establish what the withheld money is for, the police-power exception is inapplicable as a matter of law.

54. *Third*, the scope of Defendants' action belies any regulatory interest. CMS's own regulations authorize suspension "in part." 42 C.F.R. § 405.371(a)(1)–(2). Yet based on complaints concerning less than one percent of each practice's patients (Anderson Decl. ¶ 6 & Exs. A–E)—and, for Tapestry Telehealth, eight identified claims (Anderson Decl. Ex. A), one of which Plaintiffs had already caught through their own auditing (Anderson Decl. ¶ 7)—Defendants are withholding 100% of payments nationwide. Even accepting CMS's allegations at face value, the challenged services are a small fraction of the approximately $8.1 million in Medicare payments on claims for pre-petition services that Defendants are withholding. *See* Berman Decl. ¶ 12. Where a less restrictive alternative was available and affirmatively offered, withholding everything is explained only by Defendants' interest in maximizing their recovery ahead of Plaintiffs' creditors. *See Medicar*, 166 B.R. at 925 (where the effect of a non-bankruptcy scheme "is to restructure the

debtor/creditor relationship rather than advance its own fundamental concerns, the intersecting non-bankruptcy statute must yield to the Bankruptcy Code").

55. Because the Post-Petition Amounts are property of the estate, Defendants' withholding falls within sections 362(a)(1), (3), (6), and (7), and no exception applies, Plaintiffs are entitled to an order enforcing the stay as to those receivables.

### III. Plaintiffs Need Not Satisfy the Preliminary Injunction Factors, but Each Is Satisfied.

56. This Motion seeks to enforce a self-executing statutory protection, not to obtain discretionary equitable relief. In *True Health*, Judge Dorsey rejected the government's argument that the debtor had to satisfy the four-part test: because the automatic stay "is self-executing, effective upon the filing of the bankruptcy petition," "it is not necessary for [the debtor] to establish each of the factors necessary to impose a preliminary injunction because the Bankruptcy Code itself establishes the basis for enforcement of the automatic stay." 604 B.R. at 162 (quoting *In re Gruntz*, 202 F.3d 1074, 1081–82 (9th Cir. 2000) (en banc)). Rather, by showing that the post-petition Medicare payments were estate property and that no section 362 exception applied, the debtor "has shown that it is entitled to relief," with "no need . . . to show irreparable harm," a favorable balance of equities, or the public interest; "requiring such a showing would read into Section 362 requirements for application of the automatic stay that Congress did not provide for in the Code." *Id.* at 162–63 (citing *In re Minoco Grp. of Cos.*, 799 F.2d 517, 520 (9th Cir. 1986)). The Court accordingly ordered the government to release all Medicare payments withheld post-petition. *Id.* at 163.

57. So too here. Plaintiffs have shown in Parts I and II that the Court has jurisdiction, that the Post-Petition Amounts are property of the estate, and that no exception to the stay applies; Plaintiffs are therefore likely to succeed on the merits. *See Singer Mgmt. Consultants, Inc. v.*

*Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc) (likelihood of success requires only a "reasonable chance, or probability, of winning"). And although the remaining factors need not be met, each is satisfied.

A. **Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief.**

58. Although Plaintiffs need not show irreparable harm, *True Health*, 604 B.R. at 162, the showing here is overwhelming. *See Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 142 (3d Cir. 2017) (movant must show irreparable harm is likely absent relief). In *True Health*, the Court found irreparable harm because the debtor was "deprived of a significant portion of its revenues" and, without the withheld payments, would default on its DIP financing, resulting in "a loss of the ability to reorganize." 604 B.R. at 162.

59. Plaintiffs face the same harm and more. *First*, operational collapse: Medicare provides most or substantially all of each Plaintiff's revenue. Berman Decl. ¶ 7. Before the suspensions TapestryHealth incurred approximately $4.3 million in average weekly operating expenses, including approximately $2.3 million in payroll. Berman Decl. ¶ 5. Already due to the suspensions, the TapestryHealth Network's full-time workforce has fallen from approximately 500 to approximately 108. First Day Decl. ¶ 42. Available cash fell from approximately $1.44 million on September 16, 2026 to approximately $520,000 by October 14, 2026. The Debtors have since met payroll only with discretionary advances from LAGO. First Day Decl. ¶ 28. As of the Petition Date, TapestryHealth and Plaintiffs had approximately $0.4 million in unrestricted cash and, absent restored Medicare reimbursements and further advances under the debtor-in-possession financing, will exhaust available liquidity by approximately November 20, 2026. Berman Decl. ¶ 16. *Second*, the loss of the funding on which the approved budget depends: the DIP Financing, contains a milestone requiring entry of an order by November 17, 2026, failing which the approved

budget may be replaced by a reduced realignment budget and the Debtors must pursue a compressed sale process. First Day Decl. ¶ 49; Berman Decl. ¶ 17. That is not a self-inflicted harm: independent of the DIP Financing, the Debtors' cash projections show that they cannot fund payroll after approximately November 20, 2026 absent this relief, and the Debtors have identified no alternative source of financing. Berman Decl. ¶¶ 16–17; *cf. True Health*, 604 B.R. at 162–63 (rejecting the argument that a default under the debtor's DIP financing was a self-inflicted wound).

60. *Third* is harm to patients that money cannot repair. Plaintiffs have already cut services for approximately 50,000 patients between August and October 2026. First Day Decl. ¶ 41. If services stop entirely, facilities must find and contract with replacements, integrate systems, acquire monitoring equipment, enroll residents, and build new clinical workflows. First Day Decl. ¶ 45. TapestryHealth is typically the only provider of CCM, RPM, and BHI services in its facilities and usually the exclusive "preferred" provider, and in the 115 facilities in the nation's most remote communities there may be no substitute at all. Jenkins Decl. ¶ 12. Lost clinicians, terminated facility arrangements, and disrupted clinical workflows cannot be reconstituted when funds are later released. Jenkins Decl. ¶ 16.

61. No later damages award or release of funds can restore a business that has ceased operating, clinicians who have left, or facility relationships that have been terminated. Irreparable harm is not merely likely; it is already happening.

### B. The Balance of Equities and the Public Interest Strongly Favor Relief.

62. The Court "must balance the relative harm to the parties, *i.e.*, the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002). On one side is the destruction of Plaintiffs'

businesses and the loss of care for tens of thousands of vulnerable patients—consequences Defendants were told of and chose not to consider. Berman Decl. ¶ 15. *See supra* ¶ 27; *see also Healthback*, 226 B.R. at 471 ("In considering any equitable balance of harms, the plight of the patients and employees of the debtor must be considered."). On the other, Defendants suffer no cognizable harm: where the government withholds payment "for the purpose of recovering overpayments," the Bankruptcy Code provides the method for pursuing them, *True Health*, 604 B.R. at 162–63, and CMS may continue to review every claim, pursue its investigation, and seek any overpayment determination in the ordinary course. Anderson Decl. ¶ 14; First Day Decl. ¶ 39.

63. The public interest likewise favors relief. Congress "has established a system under the Bankruptcy Code that favors the ability of companies to restructure rather than liquidate." *True Health*, 604 B.R. at 163 (citing *In re Kaiser Aluminum Corp.*, 456 F.3d 328, 343 (3d Cir. 2006)). In *True Health*, the Court found that continued operation served the public interest because hundreds of jobs could be preserved and because even short delays in patient care "could potentially have serious implications for some patients." *Id*. at 162. The stakes here are greater: relief will permit continued care for a population that, before the suspensions, exceeded 140,000 residents across approximately 1,500 SNFs, including approximately 33,000 beneficiaries in rural or federally designated underserved areas, and preserve programs that save Medicare an estimated $130 million a year. Jenkins Decl. ¶ 6; Anderson Decl. ¶ 4; First Day Decl. ¶ 12. Enforcing the stay thus serves both statutory schemes: medical benefits remain available to beneficiaries and "the bankruptcy goals of reorganization and maximizing value to creditors remain intact." *Medicar*, 166 B.R. at 925. By contrast, permitting Defendants to withhold every payment indefinitely would let the government jump ahead of Plaintiffs' creditors while eliminating a

provider that Defendants have never sought to exclude from the Medicare program. First Day Decl. ¶ 40.

IV. **No Bond Should Be Required.**

64. Bankruptcy Rule 7065 provides that a temporary restraining order or preliminary injunction may be issued on application of a debtor in possession without compliance with Federal Rule of Civil Procedure 65(c). Fed. R. Bankr. P. 7065. No security should therefore be required.

## CONCLUSION

65. WHEREFORE, Plaintiffs respectfully request that the Court enter the Proposed Order (a) finding that the automatic stay applies to, and has been violated by, Defendants' post-petition suspension and withholding of the Post-Petition Amounts; (b) enforcing the automatic stay or, in the alternative, entering a temporary restraining order enjoining Defendants from reversing, suspending, escrowing, recouping, setting off, or otherwise withholding the Post-Petition Post-Petition Amounts, and requiring Defendants to process and pay Post-Petition Amounts in the ordinary course; (c) setting a briefing schedule and hearing on the preliminary injunction, if necessary and to the extent the temporary restraining order is entered without a hearing; and (d) granting such other and further relief as the Court deems just and proper.

## NOTICE

66. Notice of this Motion has been or will be provided to: (a) each Defendant; (b) the United States Attorney for the District of Delaware and the Attorney General of the United States, as required by Bankruptcy Rule 7004(b)(4)–(5); (c) the Office of the United States Trustee for the District of Delaware; (d) counsel to the DIP Lender; and (e) all parties that have requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, Plaintiffs submit that no other or further notice is required.

67. Plaintiffs reserve all rights with respect to this Motion, including the ability to seek further or additional relief, including turnover of the Suspended Reimbursements (as defined in the Complaint).

Dated: November 9, 2026
Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*<u>/s/ Ryan M. Bartley</u>*
Michael R. Nestor (Del. No. 3526)
Matthew B. Lunn (Del. No. 4119)
Ryan M. Bartley (Del. No. 4985)
Michael S. Neiburg (Del. No. 5275)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: mnestor@ycst.com
mlunn@ycst.com
rbartley@ycst.com
mneiburg@ycst.com

-and-

**ALSTON & BIRD LLP**
Gerard S. Catalanello (admitted pro hac vice)
Ryan M. Philp (admitted pro hac vice)
Seth M. Cohen (admitted pro hac vice)
Alan M. Mendelsohn (admitted pro hac vice)
Jonathan P. Wieder (admitted pro hac vice)
90 Park Avenue
New York, New York 10016
Telephone: (212) 210-9400
Email: Gerard.Catalanello@alston.com
Ryan.Philp@alston.com
Seth.Cohen@alston.com
Alan.Mendelsohn@alston.com
Jonathan.Wieder@alston.com

-and-

**ALSTON & BIRD LLP**
Leah Fiorenza McNeill (admitted pro hac vice)
1201 West Peachtree Street, Suite 4900
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Email: Leah.McNeill@alston.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*